UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ANTHONY JOSEPH MAJOY,                  )      CV 98-6956 SVW (JWJx)
                                       )
                    Petitioner,        )      ORDER ADOPTING SECOND
                                       )      SUPERSEDING REPORT AND
              v.                       )      RECOMMENDATION OF UNITED
                                       )      STATES MAGISTRATE JUDGE
ERNEST ROE, Warden,                    )
                                       )
                    Respondent.        )
_____)

I.  INTRODUCTION

        In an order dated July 11, 2002, the Ninth Circuit remanded
Petitioner Anthony Majoy's habeas corpus petition to this Court to
determine whether Petitioner's case meets the exacting threshold of
"actual innocence" from Schlup v. Delo, 513 U.S. 298 (1995), such
that his otherwise procedurally barred habeas petition can proceed
on the merits.  See Majoy v. Roe, 296 F.3d 770 (9th Cir. 2002).  The
Magistrate's Second Superseding Report and Recommendation ("SSRR")
details why Petitioner's claims do not meet the actual innocence
standard from Schlup.  Having thoroughly reviewed the record de

novo, the Court agrees with the Magistrate's findings and adopts with the Magistrate's Report.   The Court writes separately, however, to address Petitioner's objections to the SSRR and to emphasize certain aspects of the case.

## II.   STANDARD OF REVIEW

### A.   Petitioner's Request for Further Oral Arguments

As an initial matter, Petitioner requests that the Court hold independent oral arguments as part of its de novo review of the Magistrate's SSRR.   Petitioner relies in part on <u>United States v. Remsing</u>, 874 F.2d 614 (9th Cir. 1989), where the Ninth Circuit stated that a district court may hold oral arguments in response to objections to a magistrate's report and recommendation.   Petitioner quotes <u>Simmons v. Revenue Officers</u>, 865 F. Supp. 678, 679 (D. Idaho 1994), where the court said: "It is a statutory and constitutional obligation of the district court 'to arrive at its own independent conclusions about those portions of the magistrate's report to which objections are made.'"   <u>Id.</u> (quoting <u>Remsing</u>, 874 F.2d at 618).

The facts of <u>Remsing</u>, however, differ significantly from those involved in this case.   In <u>Remsing</u>, there were no transcripts of the magistrate's hearings, the district court never listened to the voice records from the hearings, and the magistrate's recommendation was delivered orally.   874 F.2d at 616.   Furthermore, the district court openly admitted to not fully understanding the magistrate's recommendation or the objections to the recommendation because of

2

1  the "lack of specificity of findings of fact made by the

2  magistrate." Id. The district court nevertheless adopted the

3  magistrate's recommendation and granted defendant's motion to

4  suppress evidence without conducting its own evidentiary hearings.

5  Id. Thus, the Ninth Circuit found that the district court

6  improperly conducted a "de novo" review. Id. Though the Ninth

7  Circuit stated that a district court may "call for and receive

8  additional evidence," the Ninth Circuit stated soon thereafter that

9  the court is "not required to hear any witness and not required to

10 hold a de novo hearing of the case." Id. at 617.

11      In this case, unlike Remsing, the Magistrate conducted extensive

12 evidentiary hearings which were properly transcribed, and the

13 Magistrate clearly explained his findings.  The Court has conducted

14 a thorough review of the testimony given at the evidentiary hearings

15 and finds that no additional oral arguments are necessary.

16 Therefore, the Court denies Petitioner's request for the Court to

17 conduct its own evidentiary hearing.

18

19      B.   Impact of New Evidence on Jurors

20

21      One of Petitioner's primary objections to the SSRR is that when

22 performing an analysis under Schlup, "it is not the district court's

23 independent judgment as to whether reasonable doubt exists"; rather,

24 the important inquiry is "whether 'in light of the new evidence, no

25 juror, acting reasonably, would have voted to find him guilty beyond

26 a reasonable doubt.'" Majoy, 296 F.3d at 777-78 (quoting Schlup,

27 513 U.S. at 329). At times, the Magistrate's analysis could

28

arguably be interpreted as the Magistrate expressing his own "independent judgment." See, e.g., SSRR, at 32. In order to make the record clear, the Court will address these aspects of the SSRR and analyze how the evidence would impact reasonable jurors. Ultimately, the Court concludes that even in those instances where the Magistrate arguably could be interpreted as expressing his own independent judgment, the evidence is not of the nature that "no juror, acting reasonably, would have voted to find [Petitioner] guilty beyond a reasonable doubt." Majoy, 296 F.3d at 777-78.

Petitioner also relies heavily on House v. Bell, 547 U.S. 518 (2006), to support his claim of actual innocence. As discussed at greater length below, however, Bell does not change the Court's conclusion that Petitioner does not qualify for the Schlup actual innocence gateway.

## III. DISCUSSION

First, it is important to understand the Court's duty on remand from the Ninth Circuit before addressing Petitioner's substantive objections. From there, the Court will address the credibility of recanting prosecution witness Michael Dominguez, Petitioner's other objections to the SSRR, and conclude with analyses of Schlup v. Delo and House v. Bell.

///

///

///

///

4

## A.   Ninth Circuit Decision

The Ninth Circuit's opinion made clear that the ultimate question for the Court on remand is whether prosecution witness and accomplice Michael Dominguez's recantation is to be believed.   In Petitioner's objection to the SSRR, Petitioner relies on the following language from the Ninth Circuit opinion:

> [Other facts implicating Petitioner] include:   (1) [Petitioner's] association with the thugs for hire; (2) [Petitioner's] writings that tend to identify the date and neighborhood of the murder; (3) his failed alibi; and (4) his receipt after the murders of $25,000 and some jewelry. Nevertheless, not one of these circumstantial facts – taken alone or in any combination – convinces us – should Dominguez's recantation and exculpatory evidence be determined to be reliable – that any rational juror would find them sufficient to convict [Petitioner] beyond a reasonable doubt.

Majoy, 296 F.3d at 777.

Petitioner insists that the Ninth Circuit found that "none of this evidence shows anything more than [Petitioner's] association with the Homicks and lack of good moral character."   (Obj., at 23.) Petitioner fails to mention that in the above-quoted passage, the Ninth Circuit had assumed that Dominguez's recantation was credible. The Ninth Circuit made that assumption to guide the Court "*should* Dominguez's recantation and exculpatory evidence be determined to be reliable."   Majoy, 296 F.3d at 777 (emphasis added).   The Ninth

1 | Circuit noted that "at no time has an evidentiary hearing ever been
2 | held on the issue" and that it is up to "the skills of the district
3 | court" to determine the credibility of Dominguez's recantation.  <u>Id.</u>
4 | at 777-78.   Thus, contrary to Petitioner's assertions, the
5 | Magistrate did not find Petitioner's guilt based only on the "other
6 | evidence," but instead found Dominguez's recantation to be not
7 | credible.   As a result, the "other evidence" mentioned by the Ninth
8 | Circuit served as corroboration for Dominguez's initial testimony
9 | and not as an independent basis for conviction.
10 |      The Ninth Circuit also stated that if Dominguez's recantation
11 | was found to be the "familiar, untrustworthy, and unreliable about-
12 | face by a self-interested criminal," then Petitioner's claim "will
13 | have failed."   <u>Id.</u> at 776.   Thus, to determine credibility, the
14 | Court must review Dominguez's recantation with a keen eye towards
15 | potentially self-interested motives.

### B.   Credibility of Dominguez

     The Court's primary charge on remand from the Ninth Circuit is
to determine whether Dominguez's recanted testimony is credible.   It
is proper for a district court to accept a magistrate's credibility
determination of a witness.   <u>United States v. Ridgway</u>, 300 F.3d
1153, 1156 (9th Cir. 2002).   Accepting a magistrate's credibility
determination without conducting a de novo evidentiary hearing does
not violate due process.   <u>United States v. Raddatz</u>, 447 U.S. 667,
680 (1980).

1        In <u>Raddatz</u>, the Supreme Court focused on the language in the

2 Federal Magistrates Act, 28 U.S.C. § 636, which states that a

3 district court must make a "de novo determination of those portions

4 of the report . . . to which objection is made." <u>Id.</u> at 674. The

5 Court found that in order to make such a "determination," the

6 district court need not conduct its own evidentiary hearing. <u>Id.</u>

7 The Court said "[w]e find nothing in the legislative history of the

8 statute to support the contention that the judge is required to

9 rehear the contested testimony." <u>Id.</u> If, however, the district

10 court were to reject the magistrate's findings, it would need to

11 hold evidentiary hearings of its own. <u>Ridgway</u>, 300 F.3d at 1157-58.

12        The Court agrees with the Magistrate that there is no basis to

13 find Dominguez's recantation credible. The Court has closely

14 analyzed transcripts in this case including transcripts from

15 Petitioner's trial and the 2004 evidentiary hearings before the

16 Magistrate. The Court finds no need for a further evidentiary

17 hearing to evaluate Dominguez's credibility. Because recanted

18 testimony is often the result of self-interested motivations,

19 "[r]ecantation testimony is properly viewed with great suspicion."

20 <u>Dobbert v. Wainright</u>, 468 U.S. 1231 (Brennan, J., dissenting from

21 denial of certiorari). Accordingly, the Court adopts the

22 Magistrate's discussion about Dominguez's testimony and its ample

23 inconsistencies.

24        In supplementing the Magistrate's findings, the Court writes to

25 emphasize that, during the evidentiary hearings before the

26 Magistrate, Dominguez almost exclusively based his recantation on

27 his desire to get out of his plea deal. (<u>See</u> 10/5/04 ERT 92, 124,

28

134-35, 157; 3/10/04 ERT 265.)  He rarely, if ever, said that he was recanting because Petitioner was actually innocent.  Dominguez explicitly said at the evidentiary hearing that the "sole purpose" for writing the letter to Judge Cooper in September 1989, in which he disavowed his earlier statements, was for him to be "given the privilege of going to trial."  (10/5/04 ERT 134.)  When Dominguez was directly asked why he did not testify at Petitioner's trial, he responded: "The reason . . . is because my plea agreement was breached by the Los Angeles district attorney's office."  (3/10/04 ERT 260.)

Dominguez repeatedly emphasized that the alleged breached plea deal was his reason for recanting:

> [T]he Los Angeles district attorney's office breached the plea agreement from start to finish . . . My plea called for the special circumstances to be stricken at sentencing, and they were not.  I suffered a conviction for the special circumstances, and I was supposed to be given the privilege to choose any prison in America to do my sentence in.  That was denied.

(3/10/04 ERT 265.)

Dominguez made it clear he wanted out of his plea deal so he could go to trial, despite the fact that he would almost assuredly face a harsher sentence from a jury.  In fact, Dominguez potentially faced the death penalty for his crimes.  It is unclear whether Dominguez ever fully understood the harsher sentence he potentially

8

faced by breaching his plea deal.[1]  Indeed, it may never be possible
to determine all of Dominguez's reasons for his recantation.  What
is clear, however, is that one of the central reasons for
Dominguez's recantation was his substantial self-interested
motivation to be released from his earlier plea agreement.  The
Magistrate's findings in this regard are amply supported by the
record.  In light of this self-interested motive, the Court agrees
with the Magistrate that Dominguez's recantation is the "familiar,
untrustworthy, and unreliable about-face by a self-interested
criminal" mentioned by the Ninth Circuit.  See Majoy, 296 F.3d at
776.

### 1. Confrontation Clause Issue

     The Court acknowledges that the statute of limitations bars
Petitioner from raising any claims on the merits unless he is found
to have passed through the Schlup actual innocence gateway.
Regardless of that fact, however, the Court wishes to address
Petitioner's comments during the evidentiary hearing before the

---

[1]During 3/11/04 (ERT at 454) cross-examination, the
following exchange occurred after Dominguez agreed he was
a suspect for murders in California and Nevada:
Q: And you were aware both California and Nevada have the
death penalty, were you not?
A: I never thought of that, no.
Q: It never occurred to you that they had the death
penalty?
A: No, it didn't.
Q: What did you think the penalty was for murder?
A: I never thought about it.

1  Magistrate to dispel any doubts as to potential Sixth Amendment

2  violations.

3      During the evidentiary hearing before the Magistrate, Petitioner

4  argued that the jury might have ruled differently had they been

5  afforded the opportunity to see Dominguez testify in person.[2]

6  (3/11/04 ERT 538.)   Petitioner argued that the Supreme Court

7  decision in Crawford v. Washington, 541 U.S. 36, 54 (2004), applied

8  to this case because a witness's testimonial statement can be

9  admissible at trial only if the defendant had a chance to confront

10 and cross-examine the witness.   (3/11/04 ERT 538-39.)

11     However, in 2007, the Supreme Court explicitly held that

12 Crawford does not apply retroactively on collateral review.   Whorton

13 v. Bockting, 549 U.S. 406, 417 (2007).   In Whorton, the Court found

14 that because Crawford is a "new rule" under Teague v. Lane, 489 U.S.

15 288 (1989), it can only be applied retroactively if it is a

16 "watershed rule of criminal procedure" that implicates the

17 "fundamental fairness . . . of the criminal proceeding."   Id.

18 (quoting Teague, 489 U.S. at 311)).   The Court then explicitly held

19 that Crawford was not a "watershed rule of criminal procedure," and

20 therefore, could not be applied retroactively.   Id.

21     In this case, Petitioner was convicted in 1990, well before

22 Crawford was decided in 2004.   Therefore, because Petitioner's

23 conviction occurred 14 years before Crawford was decided, and

24 because Whorton held that Crawford does not apply retroactively on

25

26 [2]At Petitioner's trial, Dominguez refused to testify.
   The judge properly declared him unavailable and admitted
27 his preliminary hearing testimony and recorded interviews
   with detectives into evidence.

28

10

1  collateral review, Petitioner cannot seek habeas relief from a

2  Crawford Confrontation Clause violation.

3      Significantly, even if Crawford did apply retroactively,

4  Petitioner had an opportunity – and in fact conducted – a cross-

5  examination of Dominguez at the preliminary hearing.  (3/11/04 ERT

6  539.)  "Testimonial statements of witnesses absent from trial have

7  been admitted only where the declarant is unavailable, and only

8  where the defendant has had a prior opportunity to cross-examine."

9  Crawford, 541 U.S. at 59.  Here, Dominguez was unavailable and

10  Petitioner had an opportunity to cross-examine his preliminary

11  hearing testimony.  Therefore, even if the statute of limitations

12  did not bar Petitioner from bringing a Sixth Amendment claim, and

13  even if Crawford applied retroactively, Petitioner's argument would

14  still fail.

15

16      C.  **Integrity of Detectives Holder and Crostley**

17

18      Petitioner contends that Dominguez's recantation should be

19  believed because Dominguez's initial testimony was the result of

20  police coercion by the Detectives.  In his objections, Petitioner

21  claims that the SSRR not only failed to adequately consider the

22  effect of the alleged police coercion on jurors, but goes so far as

23  to "sanction[] egregious police misconduct."  (Obj., at 16.)

24  Specifically, Petitioner insists that  the following evidence of

25  Detective Holder's unethical character was not presented to the jury

26  in Petitioner's case: (1) Detective Holder suborned perjury of a

27  criminal informant (Siegel) at the first preliminary hearing for

28

11

defendant Woodman; (2) the Detectives placed a photograph of Petitioner in front of Dominguez during the initial interview "so that [Dominguez] would identify [Petitioner] as the Ninja" (Id.); (3) Detective Holder called Deputy District Attorney John Krayniak a "wimp prosecutor" when Krayniak refused to put untruthful informant Sidney Storch on the witness stand (10/5/04 ERT 89); (4) the Detectives secretly entered into an undisclosed book rights agreement, presumably about the trial; and (5) after leaving the LAPD, Detective Holder obtained a court appointment as a phony expert witness or private investigator in the Woodman trial. (Obj., at 16.)

While Petitioner's evidence regarding the Detectives may speak to the negative qualities of Detectives Holder and Crostley, and perhaps even suggest that they used questionable interviewing tactics, this evidence does not alter the Court's conclusion with regard to the credibility of Dominguez's new testimony. This evidence regarding the Detectives does not allow Petitioner to meet the "extraordinary" burden of a Schlup claim for two reasons. First, the jury watched the interview between the Detectives and Dominguez at trial and, as a result, the jury was given the opportunity to evaluate whether Dominguez was coerced. This Court must examine "new reliable evidence" while evaluating a Schlup claim. 513 U.S. at 324 (emphasis added). Thus, because the placement of the photographs was presented to the jury at trial, Petitioner's objection standing alone would not cause a new jury to have reasonable doubts. Only Petitioner's "new" evidence – such as

1  the book deal - could be used in connection with a <u>Schlup</u> claim.

2  <u>Id.</u>

3     Second, even though Petitioner identifies some other evidence,

4  because Dominguez himself is not credible, this evidence would not

5  cause all reasonable jurors to doubt Petitioner's conviction.  Had

6  the Magistrate concluded that Dominguez was credible during the

7  evidentiary hearings, the evidence of the Detectives' negative

8  character may have supplemented the Magistrate's finding that

9  Dominguez was credible.  But given that the Magistrate found that

10 Dominguez was not credible, the evidence of the Detectives'

11 character would not affect reasonable jurors viewing Dominguez's

12 recantation.

13    For example, the fact that criminal informant Siegel perjured

14 himself at the first preliminary hearing which caused the California

15 Court of Appeals to overturn the hearing would not affect reasonable

16 jurors as to Dominguez's recantation.  Petitioner argues that it is

17 not the perjured testimony itself that would affect reasonable

18 jurors, but "Holder's subornation" of the perjury.  (Obj., at 17.)

19 As the Magistrate correctly pointed out, however, the trial court -

20 not Detective Holder - permitted Siegel to lie under oath about his

21 past as an FBI informant at the first preliminary hearing.  (SSRR at

22 26.)   Although the decision to allow Siegel to testify falsely was

23 based on Detective Holder's unsworn assertion that Siegel faced

24 bodily harm if his true identity were exposed, it was the trial

25 court that ultimately allowed the false testimony to proceed.  <u>See</u>

26 <u>Woodman v. Superior Court</u>, 246 Cal. Rptr. 42, 45-47 (1988).

27 Significantly, although Siegel did lie at the first preliminary

28

1    hearing, that testimony was never introduced at Petitioner's trial

2    and could not have affected all reasonable jurors.

3         A similar analysis is applicable to Petitioner's remaining

4    claims regarding the Detectives.  Each claim is about the character

5    of the Detectives, which cannot affect Dominguez's recantation

6    unless Dominguez is found credible.  First, Detective Holder's "wimp

7    prosecutor" comment has no bearing on Dominguez's testimony or any

8    coercion of Dominguez; second, the Detectives' book agreement by

9    itself does not lead to the conclusion that they coerced Dominguez's

10   testimony;[3] and finally, Detective Holder's subsequent job as a

11   "phony" expert witness in the Woodman trial occurred after

12   Petitioner's trial and, as a result, could not affect Dominguez's

13   initial testimony or recanted testimony.  Because each of the

14   aforementioned instances have no direct bearing on Dominguez's

15   testimony, and because Dominguez's recantation is not credible,

16   reasonable jurors would not doubt Petitioner's conviction based on

17   the Detectives' character, even when viewed in the aggregate.

18

19   **D.   Robyn Lewis's Testimony**

20

21        Robyn Lewis, who worked as a receptionist for the Woodmans'

22   business, Manchester Products, provided testimony that linked

23   Petitioner to Neil Woodman at Petitioner's trial.  Later, at the

24   1994 Woodman brothers' trial, Ms. Lewis's testimony was impeached by

25   her boss who claimed that Ms. Lewis could not have met Petitioner at

26   _____

27        [3] This is especially true since the Detectives did not
         agree to the book deal until after most - if not all - of
28       the investigation had completed.

1   Manchester Products.  Petitioner objects to the Magistrate's
2   conclusion that Ms. Lewis's testimony was credible despite the
3   impeachment.  (Obj., at 19.)  As an initial matter, Petitioner might
4   be correct that the SSRR could be interpreted as making a
5   credibility determination of Ms. Lewis's testimony instead of
6   leaving such a determination to the province of the jury.  The jury
7   would be free to accept or reject Ms. Lewis's testimony in light of
8   the impeachment.

9       Any challenge based on Ms. Lewis's testimony, however, like the
10  evidence of the Detectives' character, does not convince the Court
11  that reasonable jurors would doubt the validity of Petitioner's
12  conviction.  The California Court of Appeal decision, with which the
13  Court generally agrees, conducted a thorough exposition of the
14  evidence supporting Petitioner's conviction.  An analysis of that
15  decision reveals that Ms. Lewis's testimony was a small part of the
16  overall evidence and of relatively little importance to Petitioner's
17  conviction.  To quote the Court of Appeal:

18      [T]he evidence is sufficient to support a verdict that
19      [Petitioner] participated in a conspiracy to commit a violent
20      offense, and in fact that the offense was murder.  Apart from
21      the previously discussed evidence concerning Michael
22      Dominguez, there was ample evidence linking [Petitioner] with
23      the Homicks and the planning and execution of the murders.
24      [Petitioner's] own address book contained the telephone
25      number for Manchester Products and notations about the
26      victims' address.  Additional evidence showed [Petitioner]
27      had met with Neil Woodman several weeks before the murders

28

took place.   Ample evidence established the existence of an ongoing relationship with the Homicks, including the daily reminders of Steven Homick which were replete with references to [Petitioner.]    .  .  .   [Petitioner's]  own  admissions established his knowledge that the Homicks were involved in a  surveillance  of  people  who  they  intended  to  seriously injure  or  kill  .  .  .  Significantly  .  .  .  [Petitioner] received  a  substantial  amount  of  money  after  the  commission of  the  murders  .  .  .  Such  evidence  provided  an  additional strong link of [Petitioner] to the conspiracy and murders.

People v. Majoy, No. B052619, 39-40 (Cal.Ct.App. Jan. 27, 1997).

Clearly, the Court of Appeal did not rely heavily on Lewis' testimony.   The Court agrees with the Court of Appeal that whether Ms. Lewis's testimony was credible is not especially important to Petitioner's conviction.

Even if Ms. Lewis was found to be not credible at Petitioner's trial, however, this lack of credibility would not raise sufficient doubt in the minds of reasonable jurors to meet the Schlup standard in light of the other substantial evidence implicating Petitioner. And, although Ms. Lewis's testimony provided a link between Petitioner and the Woodmans, such a link was not necessary for the conviction.   The Woodmans hired the Homicks to commit the murders, and the Homicks in turn hired Dominguez and Petitioner to help execute the plan.   There was no need for a personal relationship between Petitioner and the Woodmans.   Therefore, not all reasonable jurors would be affected by Ms. Lewis's impeached testimony such that Petitioner could pass through the Schlup gateway.

### E.  Roger Backman's Testimony

On the night of the murders, Roger Backman witnessed a black-clad "Ninja" outside the murder scene.  The prosecutors used this information to claim that Petitioner was the Ninja.  At Neil Woodman's 1994 trial, however, Mr. Backman described the Ninja in such a way "arguably as not only to exclude the middle-aged [Petitioner,] but to implicate the youthful Dominguez."[4]  Majoy, 296 F.3d at 774.

In the SSRR, the Magistrate stated that even if Petitioner was not the Ninja, "Mr. Backman . . . heard another individual running through the bushes.  Thus, Mr. Backman's description of the 'Ninja' does not support a finding that petitioner was not a participant in the murders."  (SSRR at 32-33.)  Petitioner objects to the Magistrate's finding that Petitioner could have been a "noise in the bushes."  (Obj., at 20.)  Though the Court agrees with the Magistrate's analysis of Mr. Backman's testimony, the SSRR could arguably be interpreted as applying the incorrect standard of review by reaching what could be construed as a factual conclusion.  This Court will therefore determine de novo how Mr. Backman's testimony would affect reasonable jurors.  See Majoy, 296 F.3d at 776.

Although Mr. Backman's 1994 testimony might support Petitioner's actual innocence claim, the Court concludes that this evidence would

_____

[4]Mr. Backman testified that he identified Dominguez as the Ninja because it was the "most logical[]" choice based on Dominguez's age, skin tone, and build.  Majoy, 296 F.3d at 775.

not have such an effect on reasonable jurors such that Petitioner would meet the Schlup burden.  First, as with Ms. Lewis's testimony, the California Court of Appeal did not give Mr. Backman's testimony much weight.  The Court of Appeal decision thoroughly analyzed the evidence, and the Court generally agrees with the Court of Appeal's analysis.  After listing the substantial corroborating evidence implicating Petitioner, the Court of Appeal stated: "Finally, independent corroboration [by Backman], no matter how slight in value it might appear to be when standing alone, implicated [Petitioner] in the conspiracy and murders."  People v. Majoy, No. B052619, 38 (Cal.Ct.App. Jan. 27, 1997).  As the Court of Appeal decision illustrates, Petitioner's conviction was based on ample corroborating evidence, which included Mr. Backman's testimony, even though Mr. Backman's testimony was of "slight" value.  Because Mr. Backman's testimony was of such slight value, this evidence would not have swayed reasonable jurors to such an extent to satisfy the Schlup actual innocence standard.

Second, in discussing Mr. Backman's 1994 testimony, the Ninth Circuit stated that "Backman identified . . . the 'Ninja' in such a way arguably as . . . to exclude the middle-aged [Petitioner]."  Majoy, 296 F.3d at 774 (emphasis added).  Though Mr. Backman's statements "arguably" excluded Petitioner as the Ninja, there was nothing conclusive about his testimony at the subsequent trials.  Mr. Backman admitted he only saw a small part of the Ninja's face "between . . . just above [the Ninja's] eyebrows and just below the tip of the nose" and that he therefore could not conclusively identify the man.  Majoy, 296 F.3d at 775.  Mr. Backman's qualified

statements would not cause all reasonable jurors to doubt Petitioner's conviction.

Even assuming Mr. Backman conclusively exonerated Petitioner as the Ninja, without something more, such as substantial evidence of police coercion or clear reliability of Dominguez's recantation – both of which are lacking – Petitioner cannot reach the standard that "no reasonable juror would have found [P]etitioner guilty beyond a reasonable doubt." Majoy, 296 F.3d at 776.

Because the Court generally agrees with the California Court of Appeal that Mr. Backman's identification of the Ninja was of little import in upholding Petitioner's conviction, and because Mr. Backman did not conclusively exonerate Petitioner as the Ninja, Petitioner has failed to meet the heavy burden of a Schlup actual innocence claim.

**F.   Supreme Court Precedent**

The Supreme Court has found that an otherwise procedurally barred habeas petition could proceed on the basis of "actual innocence" in only two cases: Schlup v. Delo and House v. Bell.   A brief analysis of these two Supreme Court cases illustrate that Petitioner's case falls significantly short of satisfying the exception.

///

///

///

### 1. <u>Schlup v. Delo</u>

In <u>Schlup</u>, the petitioner, a white man imprisoned in Missouri, was convicted of murder along with two other white defendants for killing a black inmate at Missouri State Penitentiary.  513 U.S. 298, 301 (1995).  At the petitioner's trial, the state relied principally on the testimony of two corrections officers who witnessed the murders to connect the petitioner to the murders.  <u>Id.</u> at 302.  The state did not provide any physical evidence implicating the petitioner and no other witnesses other than the officers testified to his involvement in the murder.  <u>Id.</u>  By comparison, the other two defendants were much more easily implicated – defendant Stewart was apprehended at the crime scene and defendant O'Neal's clothes were covered with blood from lacerations on his hands.  <u>Id.</u> at 302 n.2.

In order to substantiate his claim of actual innocence, the petitioner presented evidence of a video that was captured by a camera in the prison's dining call.  The video showed the petitioner as the first inmate to enter the dining hall and that he walked through and got his food.  <u>Id.</u> at 303.  Just over a minute after the petitioner entered the dining room, several guards ran out of the room in response to an apparent distress call.  <u>Id.</u>  O'Neal then burst into the dining hall twenty-six seconds later covered in blood.  <u>Id.</u>

The petitioner used the videotape in conjunction with several affidavits given by fellow prisoners and filed his habeas petition

1    in federal court.[5]  The petition was procedurally barred, however,

2    because the petitioner failed to raise his new claims in a timely

3    fashion.  Id. at 309.  Despite the procedural bar, the Supreme Court

4    held that the petitioner's new evidence – several eyewitnesses with

5    no motive to lie, testimony regarding the aftermath of the murder,

6    and the videotape – was enough to meet the extraordinary threshold

7    of actual innocence.  Id. at 331.

8        Comparing the facts of Schlup with the present case, it is

9    evident that Petitioner has not reached the threshold necessary to

10   pass through the actual innocence gateway.  First, unlike Schlup, in

11   which the petitioner obtained several post-trial eyewitness accounts

12   from inmates who had not previously testified, Petitioner has only

13   one witness's recanted testimony and another witness's inconclusive

14   testimony to support his claim of actual innocence.  The

15   eyewitnesses in Schlup, such as Lamont Griffin Bey, explicitly

16   exonerated the petitioner, unlike Dominguez who rarely if ever said

17   Petitioner was "actually innocent" in his recantation.

18       More importantly, the witnesses in Schlup had no motive to

19   exculpate the petitioner, especially given the racial tensions in

20   the prison.  In this case, however, Dominguez has a self-interested

21   motive given his desire to get out of his plea deal.  In Schlup, the

22   credibility of the inmates' affidavits followed logically from the

23

24       [5] For example, inmate Lamont Griffin Bey, a black inmate,
         testified as to Schlup's absence from the crime scene
25       with the qualifying statement, "When this happened, there
         was a lot of racial tension in the prison.... I would not
26       stick my neck out to help a white person under these
         circumstances normally, but I am willing to testify
27       because I know Lloyd Schlup is innocent."  Affidavit of
         Lamont Griffin Bey, pp. 2-3 (Apr. 7, 1993).

28

1   lack of motivation to lie, whereas here Dominguez's recantation

2   lacks credibility due to his self-interested motivations.

3       Finally, in <u>Schlup</u>, the petitioner's involvement in the crime

4   was highly implausible because two other men were easily implicated.

5   As Schlup strolled into the dining hall, not sweaty or out of

6   breath, defendant O'Neal burst through the doors covered in blood.

7   By contrast, here there is corroborating evidence implicating

8   Petitioner in the crimes, such as the $25,000 deposited in

9   Petitioner's account after the murders.  There is little evidence to

10  exonerate Petitioner besides Dominguez's incredible recantation.

11      <u>Schlup</u> was a case where substantial evidence pointed to the

12  petitioner's non-involvement in the crime.  Several eyewitness

13  affidavits from rival black inmates, videotaped evidence, and

14  officers' testimony all pointed to a miscarriage of justice should

15  the petitioner have been executed.  The present case simply does not

16  meet the <u>Schlup</u> standard, especially considering the unreliability

17  of Dominguez's recantation.

18

19      **2.   <u>House v. Bell</u>**

20

21      <u>House v. Bell</u>, 547 U.S. 518 (2006), is also distinguishable from

22  the present case because of the amount of credible post-trial

23  evidence weighing in favor of the petitioner's actual innocence

24  claim, which included forensic DNA evidence.  In <u>House</u>, the

25  petitioner was sentenced to death for the murder of Carolyn Muncey

26  in Tennessee in 1985.  <u>Id.</u> at 523.  Ms. Muncey's dead body was found

27  in the woods near her house, bruised and bloodied with semen on her

28

gown.  Id. at 525.  On the night of the murder, the petitioner was seen driving around near the crime scene.  Id.  At that time he stopped to talk to the man who found Ms. Muncey's body, claiming he too was looking for the body.  Id.  When the petitioner went in to give a statement to police, he falsely claimed that he spent the night of the murder with his girlfriend.  Id. at 526.  The petitioner's girlfriend initially corroborated his alibi, but then stated that the petitioner had actually left her trailer at some point that night and had later come back shirtless, sweaty, and panting.  Id. at 527.  The petitioner was on probation for a previous sexual assault conviction.  Id. at 526.  He had scratches on his arms and hands which he attributed to his girlfriend's cat and a bruised right ring finger which he said was due to recent construction work.  Id. at 527.  Law enforcement officials seized the pants the petitioner wore on the night of the murder and sent them to the FBI along with Ms. Muncey's blood samples and other evidence.  Id. at 528.  After a serologist testified that the semen on Ms. Muncey's gown had come from a "'secretor,'"[6] the petitioner was arrested and subsequently convicted of capital murder.  Id.  A blood expert further stated that it was impossible for the blood on the petitioner's pants to have come from the petitioner and must have come from Ms. Muncey.  Id.

     To establish a motive, the prosecution relied heavily on the semen stain found on Ms. Muncey's gown:

----

[6] "Secretor" means "someone who 'secrete[s] the ABO blood group substances in other body fluids, such as semen and saliva' – a characteristic shared by 80 percent of the population, including [the petitioner].'" Id. at 529.

The evidence at the scene which seemed to suggest that he was subjecting this lady to some kind of indignity, why would you get a lady out of her house, late at night, in her night clothes, under the trick that her husband has had a wreck down by the creek? . . . Well, it is because either you don't want her to tell what indignities you have subjected her to, or she is unwilling and fights against you, against being subjected to those indignities. In other words, it is either to keep her from telling what you have done to her, or it is that you are trying to get her to do something that she nor any mother on that road would want to do with [the petitioner], under those conditions, and you kill her because of her resistance. That is what the evidence at the scene suggests about motive.

Id. at 531-32.

Following the petitioner's conviction, new DNA studies cast doubt on the petitioner's guilty verdict. First, a post-trial DNA study proved that the semen found on Ms. Muncey's gown was that of Mr. Muncey, and not the petitioner. Id. at 540. Second, the bloodstains found on the petitioner's pants were conclusively determined to not have come from Ms. Muncey at the murder scene, but rather from vials of Ms. Muncey's post-autopsy blood being transported with the pants. Id. at 542. Both the evidence about the semen and the blood was not revealed until the habeas proceedings. Id.

The Supreme Court held that a new jury would give this new forensic (and thus credible) evidence "great weight." Id. at 541.

The Court noted that the petitioner's sex-driven motivation for the murder was eliminated because the semen on Ms. Muncey's gown was not his. <u>Id.</u>  Thus, reasonable jurors would have doubts as to the petitioner's guilt.  <u>Id.</u>

Yet, despite the strong forensic evidence pointing to the petitioner's innocence, the Supreme Court said his <u>Schlup</u> claim would still fail without something "more" than the forensic evidence.  <u>Id.</u> at 548.  The petitioner, however, did produce something "more" – post-trial testimony from two women, Kathy Parker and Penny Letner, who both said Mr. Muncey had admitted to the murder while intoxicated.  <u>Id.</u> at 548-49.  Letner, who was 19 and had a small child at the time of the murder, said she was too scared to testify against Mr. Muncey at trial.  <u>Id.</u> at 550.  Parker said she tried to explain what she knew to the sheriff's department before trial but no one listened.  <u>Id.</u>  There were no clear motivations for the women to lie, and, in fact, their testimony was consistent with other evidence adduced at the habeas proceedings, which suggested Mr. Muncey was not where he said he was on the night of the murder.  <u>See id.</u> at 550-52.

In granting the petitioner's <u>Schlup</u> claim, the Supreme Court said that despite the evidence weighing in favor of innocence, the case was "close" because of the high threshold for actual innocence claims.  <u>Id.</u> at 554.

Contrasting the facts of <u>House</u> with the present case reveals that Petitioner's claim falls far short of the <u>Schlup</u> threshold. Unlike <u>House</u>, Petitioner produced zero forensic evidence exculpating himself from the crime.  The petitioner in <u>House</u> had evidence

25

proving that the semen found on Ms. Muncey's gown was not his and that the blood on his pants did not come from the crime scene.   In contrast, Petitioner presented no concrete evidence pointing to his innocence.   Furthermore, the primary motivation for the petitioner in House to kill Ms. Muncey - to cover up a sexual assault - was eliminated by the DNA evidence, while Dominguez's recanted testimony does not overcome the fact that Petitioner was paid $25,000 as potential motivation for his part in the crime.

Moreover, unlike House, in which post-trial witnesses Parker and Letner had no motivation to lie about their new testimony, Dominguez had a self-interested motivation in recanting his preliminary hearing testimony in order to get out of his plea deal.   Also unlike House, in which Parker and Letner both explicitly exonerated the petitioner by pointing to a plausible alternate actor in Mr. Muncey, Dominguez based his recantation primarily on his desire to escape his plea deal and never pointed to an alternate explanation.

Despite factual distinction between House and the present case, Petitioner also relies on House for the proposition that a Schlup claim does not require "absolute certainty about the petitioner's guilt or innocence" to succeed.   House, 547 U.S. at 538.   Petitioner argues that the Supreme Court allowed the petitioner in House to pass through the gateway despite acknowledging that other evidence at the habeas evidentiary hearing "cuts in favor of the State" and noted that the district court did not find the petitioner to be a credible witness.   Id. at 553.   Petitioner quotes the following passage from House:

26

> This is not a case of conclusive exoneration.   Some aspects
> of the State's evidence . . . still support an inference of
> guilt.    Yet   the   central   forensic   proof   connecting   [the
> petitioner] to the crime – the blood and semen – has been
> called into question, and [the petitioner] has put forward
> substantial evidence pointing to a different suspect.

Id. at 553-54 (emphasis added).

However, the above discussion shows that the Supreme Court found ample evidence that was both new and credible to allow the petitioner to pass through the actual innocence gateway.   The Supreme Court may have found some evidence that still "cut[] in favor of the State," but it clearly found more evidence cutting in favor of the petitioner's innocence.   Such is not the case here. Comparing the facts of the two cases clarifies that Petitioner simply did not present enough evidence to meet the Schlup actual innocence threshold, especially considering the lack of credibility in Dominguez's recantation.

## IV.   CONCLUSION

The Court has thoroughly examined the record as part of its de novo review and agrees with the Magistrate's ultimate decision to deny Petitioner's habeas petition as procedurally barred.   Viewed in totality, Petitioner simply does not muster enough evidence to succeed on a Schlup actual innocence claim.

Though the Ninth Circuit stated that Petitioner's evidence, on its face, raises a "possibility that . . . [Petitioner] may be able

1  to muster a plausible factual case" to meet the Schlup actual

2  innocence standard, a close analysis reveals that much of the

3  evidence is flawed.  Majoy, 296 F.2d 775.  Specifically, Robyn

4  Lewis's testimony was largely irrelevant to connect Petitioner to

5  the conspiracy and murders; the Detectives' conduct had no bearing

6  on the jury and much of their conduct occurred post-trial; Roger

7  Backman could not conclusively prove Petitioner was not the Ninja;

8  and, most importantly, Dominguez's recantation lacked credibility.

9  Because the Ninth Circuit remanded to this Court to determine the

10 credibility of Dominguez's recantation, and because this Court has

11 determined it was not credible, Petitioner's Schlup claim must fail.

12 Accordingly, the Court adopts the Magistrate's SSRR.

13

14

15

16          IT IS SO ORDERED.

17 DATED:  8/4/09

18                                      STEPHEN V. WILSON
                                        UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25

26

27

28